Ok, Mr. Seiler, we'll hear from you. Thank you, Your Honor. Please, the court. My name is Tommy Seiler, and I represent the city of McComb in this matter. Unfortunately, I've been at the helm of this case ever since it began, and I've managed to lose it a couple of times, I think. We initially, the city initially prevailed at the summary judgment stage for the district court, and there were various issues involved in it. One of them was a motion to dis, or rather, a due process claim, and the other one was a false arrest and improper arrest claim. When the case was appealed to this court, the court initially upheld the district court's decision to dismiss the arrest, false arrest claims, but reversed the district court on the due process claim and sent it back for trial. We tried this case. Mr. Sweet and Mr. Harris were, are very effective lawyers, and they did a good job on it. The jury returned a verdict in favor of the plaintiff and awarded him $150,000. And we're back now, essentially, on the principal issue of whether or not the plaintiff has proven that municipal policy was the cause of the situation that resulted in the ending of his employment with the city. The city of Macomb . . . What evidence was submitted in summary judgment that wasn't submitted at trial? Your Honor, there was . . . these cases, as you know, they take on life of their own. The issues evolve and go as time moves on. The principal issue that we were, the defendant was dealing with on the summary judgment motion was the fact that the plaintiff had come in and indicated that he was going to retire. He was leaving and then didn't report to work for three weeks. And to us, it was relatively self-evident, when somebody quits and walks away, they're not entitled to any due process. And that was the principal focus of our case. Now, we did focus, to some degree, on the municipal policy aspect of things, but not nearly to the degree that we did at trial. It was a hotly contested issue at the trial court level. Now, at the earlier level, at the earlier case, Your Honor, I can't tell you at this point that I can recall exactly what the evidence was on municipal policy. But in the . . . Because wouldn't it be law of the case if our court has already said this evidence is sufficient to reverse summary judgment and have a trial, and then that same evidence or similar evidence is presented, haven't we already passed on the sufficiency? No, Your Honor, and here's why. The court's holding in the first case that I would . . . that was the law of the case, I suppose, at the time, really had to do with whether or not the individual had been terminated or retired. And the court said that there was a dispute of facts over what the issue was, whether the individual had come in and retired, voluntarily given up his employment, or whether the city of Macomb had terminated that individual. The court really never dealt with the municipal policy issue directly. In a footnote in the case, at the very end, the court, I believe, held that the chief of police may have been a policymaker. And that on this record, I believe the way it was phrased, that on this record before the court, the chief of police may be a policymaker, and the board's endorsement of his decision or something of that nature may rise to the level of policy, but the matter needs to go back and be heard on full record. And that's why . . . But it was instructed only that the police chief wasn't given an instruction as the policymaker, right? Only the board was. In the trial . . . He was the policymaker of the trial. Right. By the time we got through the entire trial and got to the point of jury instructions, the court held that the policymaker for the city was the mayor and board of selectment of the city, not the police chief and not the city administrator. And that's exactly what they were instructed. You're correct. All right. Now, the predicate issue, I suppose you might say, was whether it was a termination or resignation, and that was pretty much determined. Now, are you challenging that finding of the jury? I mean, that clearly is a factual finding. Certainly, we don't agree with it, Your Honor, but the jury made that decision . . . All right. Then, if it was a termination, a termination instead of a resignation, then your argument is that no violation of due process occurred because he was given an opportunity and notice for hearing. But as I understand the briefs here, the notice of hearing, which was in the form of a . . . was in the form of a city council agenda, is that correct? Yes, sir. Was given after he had been given notice that he was terminated. And I know that you argue that the termination was . . . that the termination I'm speaking of was by the city manager or the city . . . whatever he's called. City administrator. City administrator. But it was on the documents and on the paper and on the stationery of the city council with all their numbers on it, they were informed about it. Well, a copy of it, I mean, they knew that the jury could reasonably, under the facts, determine that they knew of it. And then after he's terminated, when they knew that he was disputing whether it was a resignation or a termination, gave him the so-called notice that he claims he didn't get. I mean, it's just all a mess for a jury to . . . it seems like, again, this is a mess for a jury to straighten out. It was a mess, and it was a mess for the jury to straighten out. Now, if . . . I mean, if they didn't give him a hearing, if the jury found out they didn't . . . that he was terminated and that he had no pre-termination hearing and really no post-termination hearing, why isn't that the end of it? Well, let me go back and point out a few facts about this. The jury makes the decision, as they do in all cases, after the fact, in this case years after the fact, that there was a termination. Now, at that time, the board didn't have that. What the board had in front of it . . . and keep in mind, the board didn't make a termination decision here either. Only the city administrator took what he was told. Now, the jury later didn't believe it for whatever reason, and I don't know what their thinking was and what was going on in the process, but the city administrator took what he was told by his HR person that was there at the time and assumed that that was a voluntary quit, for lack of a better term, resignation, retirement, whatever. And the man didn't show up for three weeks. Okay. Was any . . . once they indicated he was in retirement, were any papers processed to show that it was a retirement and that he was entitled to benefits that might be associated with that? There were. There were two documents that were generated. One of them is, I believe, D-5, which was a letter to the plaintiff by the police chief telling him to turn in his badge and weapon and all those kind of things. That would be the same thing as termination. Well, it would be for anything. If he's left the police force, they need to get all that back. He's signed or he's retired. Right. If he's retired, he's entitled to some kind of benefits and some kind of closing procedures that are different from somebody that is fired. So, I mean, as I understand the record and the briefs, and I want to know what he . . . what the city did to show that he was . . . that he was terminated or resigned, which . . . First they sent this letter from the police chief. Then . . . Then what? Then it said, turn in all your equipment and so forth. Termination. Yes, sir. Then they sent another letter, and I don't have the site to it, my apologies, that the city . . . that he was . . . this was a number of days after the fact, I admit. One of the problems with all this, John, and I'm sorry for kind of going around, beating around the bushes on this to some degree, was they did not have . . . They did not have a human resources director at the time, and they . . . some of this was delayed by waiting until a human resources person got in place. It delayed letters and so forth that went out, but they did. Now, is . . . Judge, I know you, because you're from Mississippi, know that all these state employees, municipal employees, county employees, their retirement doesn't go . . . run through the city. It all goes through PERS or the Public Employees Retirement System, which is run by the state, run by something different. And they deal with that.  So you're not presenting a notice ever given to PERS that this person had retired? No. What we had done, and we wouldn't normally, what we do is we give the paperwork to the employee, and the employee gives notice to PERS, makes a request. He was given . . . that was part of the discussion on the day he indicated his retirement. And he was given the paperwork, told what he needed . . . He did not . . . was not treated as a retirement by the city, because the initial step for that is that he had to fill out those papers, and he never did? Well, he indicated to them. What he told the lady, Ms. LaHoma Isaac, at the time he came in was, I am retiring. I am leaving. I'm not coming back. And he didn't come back for three weeks, okay? That's all we knew at the time, all right? Whether he, you know, wanted to turn his retirement papers in then, or you know how people in public . . . those jobs in the state, they often go on to other things. They don't draw their retirement at that moment. What he does, when he takes his retirement money, it really doesn't have anything to do with us. All we knew was he tells us, I'm retiring, I've had all I can take, I don't want any more, and he doesn't show up for the next three weeks. But you're saying that as a routine, there is no difference in the administrative paperwork from a termination and a retirement, as far as the city employee is concerned? As far as the city is concerned, it doesn't matter. He's ended his employment. And they have no further obligation . . . Well, they have . . . I'd say they have the obligation to help him do what he needs to do to get his retirement funds at the point he wants to get them. And here, he also lacked a month or some period of time in having his 25 years in, or whatever the time period was. And they were going to allow him to use some stored up leave time that he had to bridge that gap, which per, as my understanding, testimony trial was, they generally allow you to do. And they were going to allow him to do that. But he didn't have to do it then. He could have done it five years from now. And, you know, he could have gone to work at the Sheriff's Department. He could have gone anywhere else he wanted to. But we would have helped him get through the process had he asked us to. But at that point, what we knew is, it's just like, you know, if your law clerk is sitting in your office before you get in one morning, and your secretary walks in and tells your law clerk, I'm through, I'm quitting, I'm gone, and then walks out the door, and you don't see her for three weeks, I mean, your assumption is going to be, she's gone. She voluntarily left. And that's what the city's assumptions were. But that's only what the city administrator's assumptions was. And he also communicated that to the police chief just so he'd know what was going on. He could get everything staffed the way it needed to be. And the plaintiff didn't show up for three weeks. Now, the city, but the problem is... Previously, we, the circuit, found that to create a fact issue about whether it was a termination or something else. And so the jury decided that. And I thought you earlier told Judge Jolly, you're not really quarreling with that. Well, we can't because the jury made the decision. Okay. So then why are we talking about it? Well, but the board didn't know that at the time. That's the issue. The board didn't know that at the time it was making these decisions. All the board knew was, my city administrator is telling me that this person retired. Okay? You're saying that there's a termination. The board didn't know about the termination. They didn't know it was a termination. They were relying on what they were being told. And the truth is, they didn't just rely on what they were being told because they, when they got to this hearing process, they said, we want to hear from this man before we make any decisions about it. Now, I understand from the arguments, I understand whether this is correct or not, but that the mayor had told the city council, or at least the city administrator, that there was a dispute as to about whether he resigned or retired and was terminated. He said he decided he's not going to resign. What the mayor said, and it's on video in the evidence, he says, I'm pleased to announce today that Mr. Anderson is un-retiring. That's the words he used. He is un-retiring. And he said it two or three times. Now, when was this? This was at a board meeting, I believe, on September the 8th of 2009. And it's part of one of the videos in the record, but that's exactly what he said. And what happened after that? They then said, we want to, well, at the time, keep in mind that this is a weak mayor form of government. The mayor has no authority other than to chair the meetings, he can't vote. All the power in the city is vested with this board of selectmen who, it's a six-member board, the only time the mayor can vote is if there's a tie among the selectmen. So he has no authority to do anything. He can say all kinds of things. There was political turmoil going on in the city at the time. Major fights, both in court and politically, between the board and the mayor and what was going on. It was a mess. And the mayor could say whatever he wanted to, but the people there knew that he couldn't do anything. And the mere fact he was making comments, because Mr. Anderson, the plaintiff, had hitched his start of the mayor's wagon. He had made the decision that that's where he was going to go. And he was going to live or die with him, and the mayor stood up for him to say he was going to come back, but he didn't. You'll hear plenty of this, I'm sure, in the argument for counsel, obviously. But I mean, my impression of this is that, as you say, it was a mess, the jury, I couldn't straighten it out, the jury straightened it out, they may have made a mistake, but they had evidence to do what they decided to do. And after we hear the arguments on the other side, you can tell me why I'm wrong. Thank you. May it please the court, I'm Terrace Harris on behalf of Mark Anderson. You know, we're here today to determine whether or not there was sufficient evidence for the jury to determine what they found. And first I want to go to, Judge Haynes asked the question, what was different in the evidence from the summer judgment stage and the trial? The evidence was the same. And as we put in the footnote in our brief, we do believe that this court prior opinion is the law of the case. Within that case, Judge Jones wrote that Chief Angelo, Mark Anderson, could only be separated from the city of Macomb in one of three ways. She wrote that either resignation, retirement, or termination. And she said if the jury finds that Mr. Anderson neither retired or resigned, it must be deemed a termination. That's exactly what the jury found in this matter. What date was he terminated? I'm sorry? What was the exact termination? What date? I have a tough time looking at this timeline and seeing a date when someone actually fired him. So what, in your, the case as you argued it and as the jury apparently went with you, on what date was he terminated? Well, Your Honor, we believe that Lockley instituted the termination from the initial meeting when he told LaHoma Isaac, the city clerk, that he can use his leave. We believe Mr. Lockley always intended to have him terminated by having him use leave and say he didn't grant the leave. But once the termination finally became effective, I think on September the 16th, the day they had him arrested for impersonating a police officer. Well, now there's substantial evidence in the record to show that the jury could have believed and had reason to believe that Mr. Anderson did not retire or that Mr. Anderson did not resign. Then there were two people who were at the meeting and the jury heard this. Well, he concedes this, but his argument is that the board didn't know that. And therefore, the fact that the jury could find that he wasn't, he didn't resign, he wasn't retired, he was terminated, doesn't alter kind of the rest of the analysis, which is what did the board think. So can you address that? Sure, Your Honor. As to the municipal liability aspect of it, the board knew on September the 8th, when they had the initial board meeting, when it was announced that he had been using his leave, he was returning. Everybody applauded, including the mayor, the board of selectors, what have you. Then Mr. Lockley testified and the jury heard clearly that they had a work session on September the 14th. And on September the 14th, Mr. Lockley said that he unequivocally told the board what his position was. His position was that Mr. Anderson was no longer an employee of the city. He told him that was his decision and that was his basis for his decision. That was on the 14th. Then, two days later, on September the 16th, when they had Mr. Anderson arrested, Mr. Lockley testified that he called the chief of police, he called the mayor, and he had his secretary, Ms. Shears, to call each of the board members to let them know what they were doing, what they were planning to do, because Mr. Anderson had returned. So at that time, the board knew that they were about to have him arrested and they approved of having him arrested for impersonating a police officer. Then, at the September the 22nd board meeting, they knew at that time that Mr. Anderson had already been arrested. The next day, a letter was sent out saying that they took the position that he had resigned on August the 27th. And the jury heard all of this? The jury heard it all. And, I mean, have you answered Judge Costa's question about the date, who fired him, when? Is that what you just answered? Well, Your Honor, I don't think there is one single piece of paper that says Mr. Anderson was terminated on a particular day. That evidence is not there. That was for the jury to figure out. That was for the jury to determine whether or not Mr. Anderson's actions I'm sorry, the jury was to determine whether first Mr. Anderson resigned or retired. And if he did not, then all of the action of the board and the relationship between Mr. Anderson and Mr. Lockley and the board and everything that had taken place, would then be deemed a termination. And the jury found that it was a termination because he was not allowed to come back. They had him arrested for impersonating. The sequence was him saying, I quit. I mean, so it is a little odd. He says, I quit. Then there's all these other things happening that no one can quite tell exactly what it is. And, sure, he tried to come back to work, but why couldn't the board have viewed that as him trying to get rehired after he quit, as opposed to, I mean, you usually don't stay at home for three weeks if you still have a job. Well, Your Honor, he never said he quit. There were only two people privy to that conversation, and that was Mr. Anderson and Ms. Isaac. And they both testified that Mr. Anderson never said he quit. They both testified that Mr. Anderson never said that he was going to retire. He said he was contemplating retirement. Why was he on the job for three weeks? Well, because Ms. Isaac, he was on leave, Your Honor. Ms. Isaac testified that she called Mr. Lockley. Mr. Lockley said it was okay for him to use his leave. Also, at that September... He was essentially on vacation for three weeks, is what you're saying? I mean, he takes leave? Yes, Your Honor. Okay, and so that's why he's not showing up, because he's on kind of this extended vacation using his leave time. Yes, Your Honor, and that was announced at the September 8th board meeting. Mr. Lockley, I mean, apparently told him he could take his leave because he had retired. Now, what... I mean, he... Mr. Lockley gave him the leave permission because he understood from the... whoever the lady was, that he had retired. And so you use up your leave whenever you retire. Well, Your Honor, Mr. Anderson had 10 1⁄2 months of accumulated leave. He had enough time to say, I'm going to take a month off without retiring. He didn't say that. Well, that's correct, Your Honor. He said... He went in, and when he met with... And the jury heard all of this. When he met with the payroll clerk to see how much time he had, he picked up the papers. He said he was contemplating retirement. He spoke with the mayor. It was announced a week later that at the board meeting that he was coming back to work on the 16th, and he was taking leave. So he never said he was going to quit. When was he arrested? On September the 16th. So when he... So he took what, from his standpoint, was leave. And then when he tried to return, or vacation, so you come back from vacation and you're arrested for showing up at your desk, is his version of the facts. Yes, Your Honor. Okay. But he didn't know... He didn't say how long he was going to be gone or anything. Whenever he left that lady's office, he was retiring. Is that right? Yes. And he didn't say, I'm taking six days leave, I'm taking any... I mean, did he say anything about leave? Yes, Your Honor. They had the conversation. The jury heard this. They had the conversation about leave. The payroll clerk called upstairs to Mr. Locklear's office and discussed the leave with him, and he said it was okay. What was okay? That he could take his leave in retirement? Or that he could take 10 days' leave? Or what... Leave? What was the... There was no specific amount of time discussed at that meeting. But when they were before the board on September the 8th, it was said that he was coming back. He was taking leave until September the 16th. Now, and it's important to note that the uncontradicted testimony was Mr. Anderson's name was on the roster on September the 16th when he went in that morning. So he was scheduled to work, showed up to work, and was arrested for showing up to work? Arrested for impersonating a police officer. Now, was he supposed to come to work that day? Or did he just show up for work that day? Well, Your Honor, it was announced he was returning on the 16th. The uncontradicted evidence was his name was on the schedule for the 16th. Had he been on the schedule for the three weeks he was missing? On vacation? Well, that I don't know, Your Honor. In other words, they just showed up on the list or did they actually know he's coming back on this day? Well, there was no evidence that was placed before the jury to address that. Okay, so what the jury heard was he was on the list to be there on the 16th, he shows up on the 16th, and then he's arrested for basically doing the job that he thought he was supposed to do. Yes, Your Honor. Yes, Your Honor. When we go to the opportunity to notice and opportunity to be heard, they have taken a position that he was given notice and opportunity to be heard, but they have also taken a position that he quit. So if they took the position that he quit or he retired, why would there be a notice and opportunity to be heard? That's somewhat of a moving target with us. Well, the whole case is an opportunity to be rehired. They were considering rehiring him, which might not be the same type of opportunity to be heard that he needs. I'm sorry, Your Honor. I thought their position is we thought he retired and was asking to be rehired, so that's why we gave him this opportunity to plead to be rehired after retirement. Well, their arguments have been and have always been, well, if he was terminated, then he had an opportunity to be heard. All of this is the issues that we're really trying to, I mean, the issue here really is municipal liability, right? Yes, Your Honor. Let's talk about that. Yes. All right, Your Honor. Here, we know, Your Honor, you had the opinion in the city of Fort Worth case where you addressed a case where a subordinate's decision can be ratified by the final policymaker's board if the board approved of the subordinate's position and if they understand the basis, if they were informed of the basis of their position. But the court extended that and said that can only be done under extreme factual circumstances. So, here, under that avenue, there's sufficient evidence before the court to attach municipal liability. As I mentioned earlier, the board knew of Mr. Lockley's decision on September 14th at the work session. He testified unequivocally that he spoke to the board and he told the board that it was his position that Mr. Anderson was no longer an employee because he felt that he had retired. The administrator told the board that? Yes, Your Honor. And what happened? Then, on the 16th, the board was also informed of Mr. Lockley's decision that he was going to have him arrested for impersonating a police officer because he felt as if he was no longer an employee of the city of Macomb. So, there's two occasions there where the board of selectmen knew of the subordinates Mr. Lockley's decision and his basis for that decision. So, those two instances... Mr. Lockley, the administrator, told the board that he had retired initially. Is that correct? Yes, Your Honor. And then the next thing that I understand you say that occurred was that they had him, when he showed back up for work, he was arrested. Yes, Your Honor. Alright, now, if the board understood that he was not an employee that he had retired, that he showed back up whenever he had not been called, that he took a vehicle out without any kind of authority and he was not even an employee at that time, then they could, it seems like, I mean, they went to extremes and it's they had him arrested. But anyway, they had the authority to do that. Now, at what point, now, if, on the other hand, they said they had terminated him and not given him a hearing, you get, and the board knew that, then they have endorsed what actually occurred. But now, the board, the way you've told me, and I'm getting confused here talking to you, what the board at the time that they arrested him, they thought he had retired and that he had no authority for that car. Is that right? Well, Your Honor, the board, on the 8th, and this prior to the work session and prior to the arrest, they knew he was coming back. So the board knew at that time he had not retired. The board knew he was scheduled to come back on the 16th. How did they know that? Because that was at, that came out at the September the 8th board meeting. I thought at the September the 8th board meeting, is that, that is where the mayor said that he is unretired? Yes, Your Honor. And what did they, he told the board he is unretired. Meaning what? Well, Your Honor, the jury heard a whole line of questioning about unretired. And Mayor Patterson explained to the jury that that was a bad choice of words because he never retired because he didn't execute all the appropriate paperwork that he needed to execute. So, obviously he was basing that on his conversation. He and Anderson were political allies. Is that correct? That's correct, Your Honor. So the mayor, the Anderson told the mayor he was retiring. The mayor says, oh, don't retire. And so he says, well, okay, well, I won't retire. But he'd already said to the city manager that he was going to retire. But he tells the mayor now that I am unretired and I'm not going to retire. So at what point in the city, in the  he is unretired but the official report that had come back from the And then he comes back unannounced and takes a car. He doesn't say when he's coming back. And then he takes a certain amount of leave. He comes back, he takes a car, and he gets arrested. I mean, the question is what Judge Costa asked initially. At what point was he terminated? Well, Your Honor, I think he was definitely terminated on September the 16th when they had him arrested. I think that's the line that should be drawn in the Senate. He was definitely terminated on that day. September the 14th, two days prior, they had to board him. He was terminated there for criminal activity. Actually, they presented it to the grand jury, didn't they? Well, no, Your Honor, he had a probable cause hearing. Yes, because he was a city employee. He was a police officer. They had to have a probable cause hearing. But, of course, those charges were remanded. Nonetheless, What day did he un-retire? Well, Your Honor, the term un-retire really is a bad choice of words. As the mayor explained to the jury. That's the word the board heard. I mean, the question is how the board should have interpreted it, not what he actually really meant. Well, yes, Your Honor, but on the 8th, they knew he was coming back. They knew he was taking leave. Is this a fact question, what the jury should have understood from this whole morass that we're slogging through? Yes, Your Honor. The jury heard all of this and the jury found that he was terminated. The jury found that he was not given sufficient due process. As everyone recognized, it is a mess. He was terminated when he returned. I guess he had a hearing whenever they were deciding probable cause for whether he should be arrested or not. I'm sorry, Your Honor? He must have had a pre-termination hearing. I guess a post-termination hearing. I guess it would have been. Whenever he had a probable cause hearing as to whether he was authorized to take that call. Well, Your Honor, it's interesting also because at that same hearing that they had on this matter, the home of Isaac, the city clerk, testified there that he never retired and he never resigned. Those two... Because they said he unretired. You can't unretire if you haven't retired. Well, Your Honor, the jury heard the mayor say who was a bad choice of words and that he had never retired because he never executed the paperwork. Now... He didn't express the intention to retire, obviously. The mayor went back and says, don't retire. He says, okay, I won't retire. I'll come back to work. He had intentionally retired in his own mind apparently, according to me. Well, he may have contemplated and the jury may have thought this. He may have contemplated because that's what he said. I contemplate retiring all the time. And then somebody in your family talks you out of it. Right. But when I go home and look at my kids, I realize I have 25-30 years left. So, but at the end of the day, the jury heard all of this evidence and there was sufficient evidence before the jury to support their findings. And as this court previously held, if the jury found that he did not retire, he did not quit, then the only other choice he had to have been terminated. And if he was terminated as this court previously held, then it's more unlikely than not he received sufficient due process. And the jury found he had not received sufficient process. Thank you. Hey, Mr. Silent. Alright, let me get back to addressing your last question. If this had been a case in which the individuals had been sued and the jury made the findings that it found that the individuals didn't do correctly and found that it actually terminated him constructively or whatever, I don't know that I'd be here at the moment. This has got to do with whether there's a policy. The court, district court held at trial that the board of mayor and selectmen were the policy makers for the city. And that has not been cross appealed. And if there's a law of the case argument here, I believe that has to be it. Because they've not cross appealed that. So what did the board do here to bring this to a level of a policy? There's no proof that things have been happening along the way, that they've done this before. All we have is that these part-time political people in a relatively small city who have other jobs. They go to a board meeting and they're told that this individual's retired. Now, what did they do to ratify what these people did? Whether they terminated him wrongly, misinterpreted what he said, whatever, what did this board do to raise this to a level of a policy? And the answer is they did nothing. They didn't even accept their own city administrators' word for it. They said, before we do anything else, we want to hear from this gentleman. Bring him to us. And they didn't say it once. They said it twice. They said it at the work session on September 14th. They said it again at a formal board meeting on September 22nd. It's in video. It's there. You can look at it, hear it, and see where they voted in a motion that we want this individual to come in and talk to us so we can determine what to do. Now, the other thing about it that just really I'm not smart enough to figure this out, I'll admit. But counsel in the trial says both at sidebar and to the jury in closing, I would not have let him come to a hearing and testify because there were pending criminal charges. Now, if this whole case is about a due process hearing and his lawyer's telling him to testify, then I would     I'm not sure that's going to happen. Okay. The clock wasn't going. Okay. If they've been telling him no evidence, he would have listened to his lawyer. Defendants in criminal matters ignore their lawyer's advice all the time. They basically never testify. I guess that's a possibility. You need conclusive evidence. What I just heard was that he was terminated whenever they arrested him. So the termination occurred at the time that he was arrested. What did the city council have to do with his arrest? Nothing. Did the city council ever approve the fact that he was arrested? No. They didn't approve it. They didn't know about it. Who approved the city filing a complaint against him, or somebody did, that caused his arrest for impersonating an officer? I know the district attorney was in on it. District attorney, the county sheriff, the city attorney, I believe, was all involved in trying to talk through this. Did the city council ever act on that? No. The city council, according to what he has just told us, had nothing to do with his discharge. They had nothing whatsoever to do with it. Nobody did. Because nobody ever told him he was terminated. He testified in trial that no one ever told him he was terminated. We have law of the case on that. That's a jury question. The jury found termination. So we can't re-hear that, in my view. And so then we've got this problem of he was arrested with, it sounds like, everybody in the city in on it. The DA and the sheriff and this and that. But then this board who knows all about all of this and it seems like all these people know each other and are kind of involved in all this at a very intricate level. Okay. And so they know all this and then they just let this happen. All of that happened before the board got involved. That's the whole problem with all of it. We can talk about, go around and around about the facts but the board is always after the fact in everything. And it wasn't the DEA judge, just as a matter of clarification, it was the DA. I'm sorry if I've misunderstood. And the judge, I mean the police chief just didn't go out and they just didn't decide in five minutes that this was going to happen and he didn't just show up at his desk. He gets in a car, he goes out, they're trying to get him back, they send people out to talk to him to come back, tell him the chief is ordering him to come back. All these things go on and it goes on all day long before they find out what are we going to do to deal with this situation. That's when they started seeking advice from the DA and that sort of thing and they put affidavits together, went to a judge, got warrants from a judge. If he hasn't been terminated, can he show up now and start working? No, he's quit. He's not an employee. Well, but they found he was terminated and now you're saying the city council didn't terminate him, he's really not terminated, so can he go back? I would say that ultimately when the judges or when the court's judgment is final, yes. Although the court at this point by the way, the court at this point has ordered that he's not going to be reinstated. If we reverse because the board didn't approve this termination, is he then eligible for, should he be reinstated and given back pay for all of this time that he was wrongfully left floating around because he really wasn't terminated because the board hasn't terminated him? Well, the court's ordered that he be given back pay for all that time. No, but that's on the current scheme. You're asking us to reverse that and I'm saying what happens if we do because under your version of the world, he wasn't terminated either. No, he quit. But you accept that the jury found he was terminated, you're saying the board didn't approve it. I'm saying, alright, he was wrongfully terminated then by some underling and the board is hands off. He still gets his back pay. Well, no. I respectfully disagree with you for that. Well, the reason it wouldn't be that way is he's got to win under 1983 which he can only win under 1983 if a municipal policy caused his injury. So it doesn't matter what the city administrator did, the police chief did, it's whether the city policy caused this. If this court was to rule that the city that there was no city policy that caused him to be terminated, then he's gonna lose the case and he would have he's no longer an employee. Okay, but it just seems like you're trying to have it both ways. I agree it's not a 1983 case necessarily, but it's some sort of case if he's been treated as a terminated employee wrongfully. Does he not have some right then under state law? Now that I don't know. The problem is it seems like you're saying that you want the world to change based on something the jury didn't find, but I'm not sure the changed world necessarily changes anything because this guy was terminated, the city didn't let him back in, the board didn't let him back in, they knew he wasn't still working and yet you're trying to ask us to kind of rewrite history and I think the rewritten history doesn't really go your way. I see your point. I don't agree with it. I'm out of time. That's a great point.